# GEORGE LOCKNER v. THE EICH MOTOR COMPANY AND ANOTHER.

167 N. W. (2d) 51.

April 3, 1969—No. 41139.

*Robb, Robb & Van Eps* and *Raymond W. Fitch,* for relators.
*Murphy & Reichert,* for respondent.

OTIS, JUSTICE.

This matter is before the court to review a decision of the Industrial Commission awarding the estate of a deceased employee compensation for permanent partial disability between the time of his injury and the date he discontinued employment.[1]

Decedent sustained a personal injury arising out of this employment on August 26, 1963. Following the accident, he continued to work without loss of wages until February 27, 1965. Thereafter, and until April 3, 1966, decedent was awarded temporary total disability benefits. On

---

[1] This case was first heard by this court sitting in division. Because less than four justices in the divison concurred in the majority opinion, the case was further considered in conference by the full bench as provided by Rules of Civil Appellate Procedure, Rule 135(3). Thereafter it was submitted to the non division justices on the record, briefs, and a tape recording of the oral arguments—as provided by Rule 134.07(4)—without a rehearing.

April 4 he began to receive compensation for permanent partial disability and died of unrelated causes on June 3, 1966. He left no surviving dependents, and these proceedings are brought to recover only such compensation as he himself was entitled to receive prior to his death.

At oral argument the issues in the case were reduced to the single question of whether or not decedent was entitled to compensation for permanent partial disability between the date of the accident and the time he was obliged to give up his job, in the absence of evidence of when the disability began.

The referee found that decedent sustained a 40-percent permanent partial disability to his right lower extremity and allowed benefits for such disability from the date of the injury without a specific finding of the percentage of disability which occurred at the date of injury. On appeal the commission affirmed, holding that its policy was to award compensation for permanent partial disability subsequent to the injury regardless of whether the employee sustained temporary disability and without reference to whether he lost time from work. In justifying this policy, the commission pointed out the difficulty of establishing the precise time when permanent disability begins. The commission cited as authority Durant v. Butler Brothers, 275 Minn. 487, 148 N. W. (2d) 152, 24 Minn. W. C. D. 91. There, however, the court simply held that the employee should not be denied permanent partial benefits merely because he continued to work.

We find nothing in Minn. St. 176.101, subd. 3, which authorizes benefits for permanent partial disability without evidence which establishes the time when the disability began. Neither the referee nor the commission fixed the date when decedent's 40-percent permanent partial disability actually commenced. They merely applied their own rule that once permanent partial disability is established, the benefits based on such disability accrue on the date of injury.

The record before us indicates that following the accident decedent continued to work with the use of a cane and crutches but not without apparent distress and difficulty. The X rays taken at the time of the accident disclosed no recent fractures. A later examination in September 1964 revealed healed fractures of the right pelvic bones and a degenera-

tive change in the right hip and indicated that a fracture of decedent's hip at the time of the accident had been undetected in the initial examination.

In answer to counsel's questioning as to whether the decedent had a permanent disability from the date of the original accident, one doctor stated:

"My answer is that the injury that he had in '63 undoubtedly lead up to permanent disability."

Thereafter, the doctor was asked the following:

"Doctor, so we have the record straight, so it's your opinion that he did not sustain—there's no permanent disability between August of '63 and February of '65, is that true?"

The witness answered:

"I think that's my reasonable answer."

The force of the doctor's opinion was diluted by his subsequent testimony that he believed the employee could not have been disabled before February 1965 because he continued to work during that period.

An orthopedist who first saw decedent in April 1965, performed two operations. He testified as follows:

"Q. What was his essential problem with the hip?

"A. The patient had fallen and fractured the neck of the femur which damaged the circulation to the head of the femur, the ball of the ball and socket joint, and this then went on to avascular necrosis and the head disintegrated and became rough, painful joint.

"Q. What did you do in the first surgery?

"A. In the first surgery the—this damaged head of the femur was removed and a femoral head prosthesis, a metal ball, was put in its place.

"Q. And what did you do in the second operation?

"A. In the second operation it was a similar procedure excepting that it was found that he had such large bones that it was necessary to use a different type of prosthesis, a newer type that had come out for this specific purpose. So the old one was removed and new one put in."

In giving his opinion of the date when the healing period terminated, the witness stated:

"Well, to me, as a medical doctor, this is all one continuous condition. I mean, it's obvious now—it wasn't obvious to the original doctor—but it's obvious that his man had an injury when he fell and it wasn't recognized. I'm sure I couldn't have recognized it, either, because I've seen those original X-rays and they didn't show it. But, looking at the over-all picture now, it's obvious that this trouble started when he fell and finally terminated following some—some time following surgery."

He concluded by stating that when he examined decedent in March 1966 decedent was suffering a 40-percent permanent partial disability of the lower right extremity. When asked whether the injury resulted in some permanent disability between the date of the accident and February 27, 1965, the doctor replied:

"Well, I don't think that—that I can say. I mean, this is a progressive thing.

\* \* \* \* \*

"He certainly had—he was disabled from walking, from working, from lifting and so forth, but to—to pick out any certain time in a disease which is progressing steadily and say that at this point he had permanent—just be a wild guess."

The doctor later was unable to say whether decedent was suffering from a 40-percent disability before surgery was performed in May 1965 or to give an opinion it was permanent during the period the employee continued to work. We conclude that there is no support in law or in fact for awarding permanent partial disability retroactively to the date of the accident where there is no testimony to support such an award. To hold otherwise would be to confer benefits based on pure speculation and conjecture. The decision of the commission is therefore reversed.

Reversed.

SHERAN, JUSTICE (Dissenting).

As a result of the accident which occurred on August 26, 1963, the employee sustained fractures in the region of his right hip, including a

fracture of the neck of the femur, which were not discovered at the time although X rays were taken. He continued to work but with considerable difficulty. The condition regressed to the point that he was totally disabled on February 26, 1965. It was then discovered that the fracture of the neck of the femur had impaired circulation of the blood to the head of the femur (the ball of the ball-and-socket joint). As a result, the head of the femur had disintegrated. Surgical procedures were instituted whereby the head of the femur was removed and replaced with a metal ball.

The commission has found, and relators do not contest the fact, that the employee's hip had so far deteriorated by February 27, 1965, that he was then totally disabled—a condition which continued until April 3, 1966, at which time he was given a permanent partial disability rating of 40 percent to the right lower extremity. Having made this determination, the commission declared, in effect, that entitlement to benefits for the permanent partial disability commenced as of the date of the accident which produced the disability.

The effect of the majority opinion, which reverses the commission's finding, is to deny the employee compensation for an 18-month period during which he was attempting to work notwithstanding fractures of such severity that total disability was relieved only by drastic surgical intervention. There is no provision of the Workmen's Compensation Act which requires such an unusual result.

On the contrary, the determination of this court in Bergstrom v. O'Brien Sheet Metal Co. 251 Minn. 32, 86 N. W. (2d) 82, that the statute of limitations, Minn. St. 176.151(2), in a case such as this commences to run on the date of the accident rather than on the date the employee establishes the measure of his disability suggests inferentially that the right to compensation should also be measured from the time when the accident which produced the disability happened. So long as there is no duplication of weekly benefits, this would seem to be the better way to interpret an act designed to relieve employees injured in work-connected accidents. See, Durant v. Butler Brothers, 275 Minn. 487, 148 N. W. (2d) 152, 24 Minn. W. C. D. 91.

176

NELSON, JUSTICE (Dissenting).

I concur in the dissenting opinion of Mr. Justice Sheran.

FRANK T. GALLAGHER, JUSTICE (Dissenting).

I concur in the dissenting opinion of Mr. Justice Sheran.

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.